# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| PATRICE WILLIAMS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.: 2:12-CV-402-PRC |
| | ) | |
| UNITED STATES STEEL | ) | |
| CORPORATION, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

On June 23, and 24, 2014, Plaintiff Patrice M. Williams appeared in person without counsel. Defendant United States Steel Corporation appeared by Department Manager Robert Chorzempa and by counsel M. Cristina Sharp and Terence M. Austgen. A Bench Trial was held. The Court received evidence and arguments.

Based upon the record of proceedings the Court FINDS, ORDERS, ADJUDGES, and DECREES:

## PROCEDURAL HISTORY

In November 2011, Plaintiff Patrice M. Williams filed a Charge of Discrimination against her employer United States Steel Corporation (hereinafter usually referred to as U.S. Steel) with the United States Equal Employment Opportunity Commission (EEOC). At the request of Ms. Williams, a Right to Sue Notice was issued by the EEOC. The EEOC took no further action in the matter after issuance of the Right to Sue Notice.

On October 1, 2013, Plaintiff Patrice M. Williams filed in this Court her Amended Complaint [DE 53]. On October 16, 2013, Defendant U.S. Steel filed an Answer to Plaintiff's Amended Complaint [DE 56].

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

On January 23, 2013, Ms. Williams filed a Motion to Cease and Desist Denial of Regularly Scheduled Off Days and Vacation Days [DE 23]. On April 2, 2013, Ms. Williams filed a Motion for Temporary "Real" Sabbath Accommodation [DE 32]. The Court construed both motions as motions for a temporary injunction. On May 2, 2013, the Court held a hearing on the motions. On September 20, 2013, the Court issued an Order denying both motions [DE 51].

On May 23, 2014, the Final Pre-Trial Conference was held. On June 23 and 24, 2014, the Bench Trial was held.

## PLAINTIFF'S CLAIMS

The claims of Ms. Williams in her Amended Complaint are brought pursuant to Title VII of the Civil Rights Act of 1964, in particular 42 U.S.C. § 2000e-2(a), alleging discrimination against her by U.S. Steel.

She claims U.S. Steel violated federal law by:

1.      Failing to make reasonable accommodation for practice of her religious beliefs;

2.      Discriminating against her based on her female gender;

3.      Creating or allowing harassment of her by a hostile work environment.

U.S. Steel denies each of Ms. Williams's claims.

Ms. Williams seeks relief in the form of:

1.      A permanent injunction against U.S. Steel;

2.      An award of money damages;

3.      An imposition of punitive damages.

**BURDEN OF PROOF**

The burden of proof in this case is on Plaintiff Patrice Williams to prove her claims by a preponderance of the evidence. *See Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1350 (7th Cir. 1995).

**FINDINGS OF FACT**

Plaintiff Patrice Williams was hired to work at U.S. Steel on October 13, 2008. She was hired as a Utility Technician – Labor Grade 2. Her first work assignment was in the Tin Department at the Gary Works plant.

At the time Ms. Williams applied for employment, U.S. Steel informed her that its business operates continuously twenty-four hours per day, 365 days per year and that employees are scheduled to work rotating shifts, which include working on Saturdays, Sundays, and holidays. U.S. Steel asked Ms. Williams if she accepted these schedule requirements; she said yes. At that time U.S. Steel also gave her a company document entitled Job Requirements essentially stating the same thing.

The Job Requirements document given to Ms. Williams by U.S. Steel states, in pertinent part:

> U.S. Steel's facilities operate continuously; 24 hours a day, 365 days a year. The Utility Technician position requires you to work rotating shifts. For example, one week you may be required to work from 7:00 AM to 3:00 PM, the next week from 3:00 PM to 11:00 PM, and the following week from 11:00 PM to 7:00 AM. This also means that you may be required to work different days of the week each time you rotate shifts. In other words, the days you have off will not be the same every week and you may be required to work Saturdays, Sundays, and holidays

3

The position also requires you to work mandatory overtime as needed, often with little or no notice.

Last but not least, punctuality and attendance are extremely important to the success of the operations in general as well as contributing to an overall positive team environment.

The standard shifts at U.S. Steel are: 11 p.m. – 7 a.m.; 7 a.m. – 3 p.m.; and 3 p.m. – 11 p.m.

At all relevant times, Ms. Williams was employed and working at U.S. Steel. She remains employed and working at U.S. Steel. And, at all relevant times, Ms. Williams was, and is, a bargaining unit union employee subject to the terms and conditions of employment for union employees governed by a collective bargaining agreement between U.S. Steel and the United Steelworkers Union called the Basic Labor Agreement (BLA).

The BLA provides a three step employee grievance procedure. The BLA also provides for a seniority system used by U.S. Steel when scheduling work shifts. U.S. Steel maintains policies prohibiting discrimination based on, among other things, religion and gender, as well as a policy prohibiting harassment.

Sometime after Ms. Williams began working at U.S. Steel, she became an active, practicing Seventh Day Adventist. Ms. Williams continues to be an active, practicing Seventh Day Adventist. She sincerely holds to and devoutly practices her religious beliefs. It is important to Ms. Williams, as a Seventh Day Adventist, to observe the Sabbath (Friday sunset through Saturday sunset) which includes that a believer do no work on the Sabbath.

Ms. Williams began working in the Pickle Department ("pickling" refers to a process of using acids to clean steel) in early September 2011. Her first request to not work on the Sabbath was made her first or second day at the new position.

4

Although U.S. Steel has on many weeks scheduled Ms. Williams to work on the Sabbath, she has managed to have never worked on the Sabbath, primarily by trading work shifts with co-workers as well as using sick and vacation days.

As a result of her success at arranging to never work on the Sabbath, Ms. Williams has not experienced discipline by U.S. Steel for not working on a Sabbath aside from once requiring her to take absentee counseling. She has suffered no adverse consequences to her rate of pay nor other terms, conditions, and privileges of employment. She has not been demoted, transferred against her will, or terminated from her employment. Nor did she have her scheduled work hours reduced; she did not lack opportunities for overtime or opportunities to bid on other work positions. Nor were her benefits compromised.

While working in the Tin Department, Ms. Williams signed a bid for a crane operator position in the Pickle Department. She was the successful bidder and was awarded the crane operator position. She started working in the Pickle Department in early September 2011.

Throughout Ms. Williams's tenure in the Pickle Department, the department was frequently short of qualified crane operators. If there are an insufficient number of crane operators in the Pickle Department, steel coils moving through the pickling process cannot be moved in a timely manner, causing delays. This in turn affects other operations in the manufacturing process, forcing other departments to either slow or stop their operations until the Pickle Department is able to keep up with the flow of steel moving through it.

To become a crane operator, employees receive specialized training. And because many of the overhead cranes are different from each other and perform different functions within the department, crane operators receive additional training on each overhead crane they operate. Due

to the shortage of qualified crane operators during the time Ms. Williams was in the Pickle Department, crane operators were working fifty-six hours some weeks.

Rob Chorzempa was the Operations Coordinator in the Pickle Department. As part of his duties, he created the employee work schedules for the department each week. The Pickle Department work schedule was posted every Thursday.

Chorzempa used the Timken scheduling system as a general template and made adjustments to the template to deal with material shortages, vacations, and other considerations. A Timken schedule is a neutral scheduling system used by various industries that have around-the-clock operations and workers on rotating eight-hour shifts. A Timken schedule rotates employees on various shifts throughout the month and gives them different days of the week off during the month.

Overtime work and pay at U. S. Steel is controlled by the BLA. The overtime rate of pay is one-and-one-half times the normal rate of pay. Overtime pay rates apply whenever an employee works more than eight hours per day or more than forty hours per week. Under the BLA, the normal work week consists of five consecutive workdays and two consecutive days off.

If a crane operator unexpectedly calls off from work before the shift is to start, U. S. Steel will first ask other crane operators who are already there working the prior shift to stay over and work an extra eight-hour shift with overtime pay.

If none of the crane operators volunteer, then U.S. Steel will require the most junior crane operator to stay over and work another eight-hour shift. If the most junior crane operator is already coming off from working a double shift, the next most junior crane operator will be required to stay over. If—due to scheduling reasons, the seniority system, and the BLA—U.S. Steel is unable to require any of the crane operators to stay over, or the prior crew left before the call-off came in,

6

U.S. Steel managers will call crane operators at home to try to get them to come back in to work.

Employee overtime is closely scrutinized by U.S. Steel. Its managers try to limit the amount of employee overtime to control costs. Excessive employee overtime also increases safety concerns and decreases employee morale.

As soon as Ms. Williams transferred to the Pickle Department, she gave her Area Manager, Jeff Hacker, a note from her pastor explaining that she was a Seventh Day Adventist who observed the Sabbath from sunset Friday to sunset Saturday. The note requested that U.S. Steel make accommodations for her so that she would not have to work on the Sabbath.

Hacker advised Ms. Williams that, as a temporary arrangement, if she was scheduled during her Sabbath, she could call off from work giving the Sabbath as her reason until he had time to look into the matter.

Hacker then contacted Lucas McElfresh in the Labor Relations Department about Ms. Williams's request. McElfresh advised that he would need to research the matter and then respond to Hacker. A couple of weeks later, McElfresh advised Hacker that employees could trade shifts with willing co-workers as an accommodation for their religious practices.

Another employee in the Pickle Department who observed the Sabbath is DeJuane Lee, Sr. Lee is a Hebrew Israelite. Hebrew Israelites and Seventh Day Adventists have the same religious practices regarding observing the Sabbath.

On or about October 7, 2011, Hacker held a meeting with Ms. Williams, Lee, and their United Steelworkers Union representative. Hacker advised Ms. Williams and Lee that calling off from work for the Sabbath would no longer qualify as an excused absence.

Hacker warned them that unexcused absences for the Sabbath would be subject to normal

disciplinary procedures. Further, if Ms. Williams or Lee were scheduled to work during a Sabbath, they could try to trade shifts with co-workers.

The union representative requested that Ms. Williams and Lee be given a grace period of two weeks before the policy took effect so that they could have time to make arrangements with co-workers. Hacker agreed to this. For the next four or five Friday–Saturdays, Ms. Williams called off from work for the Sabbath, but was not disciplined by U.S. Steel.

Lee was a Labor Grade 1 employee and worked in a Laborer position (a different Labor Grade than Ms. Williams and a different position with a different job description than Ms. Williams). Laborers normally work Monday through Friday.

As a Laborer, Lee performed various assignments based upon the needs of the department. On many occasions, Lee would be scheduled to fill in on Labor Grade 2 positions. However, he was not a qualified crane operator and could not fill in on that position. While filling in on a Labor Grade 2 position, Lee was paid at a Labor Grade 2 pay rate pursuant to the BLA. However, he remained in the Labor Grade 1 employee category.

Lee worked well with other employees and rarely called off from work. When filling in on various positions, he was willing to help out other employees when they wanted to have a certain day off or needed to trade shifts. In return, on most occasions, Lee was able to trade his Saturday shifts with co-workers so that he could observe the Sabbath.

In addition, Lee sought other job positions to fill so that his work schedule would accommodate his Sabbath observance. For instance, when the employee who worked in the acid unloader (also called acid tender) position was going to be out on medical leave for several weeks, Lee approached Chorzempa and requested to fill in for that position.

The vendor who supplied the acid only made deliveries Sunday through Thursday, so this schedule worked well for Lee. Since management did not have anyone else to fill in for the regular acid unloader, this was beneficial for the company as well.

On one occasion, Lee could not get anyone to trade his Saturday daylight shift. Lee called off from work and indicated that the reason for his call-off was the Sabbath. Lee's absence on that occasion was not excused, and he was issued a written warning by U.S. Steel.

In addition to calling off from work for the purpose of observing the Sabbath, Ms. Williams also called off from work on a number of other occasions for other reasons before her shift was due to start. On those occasions her fellow crane operators were forced to work an additional eight-hour shift without prior notice in order to cover her absence.

As a result of too frequently and unexpectedly being forced to work double shifts due to Ms. Williams's call-offs, many of the other crane operators did not want to trade work shifts with her. Additionally, some crane operators found Ms. Williams difficult to get along with, which also made it difficult for her to secure work shift trades with them.

Chorzempa was approached at various times by union representatives who indicated that the other crane operators were complaining about being forced to work additional shifts because of Ms. Williams's call-offs. Other managers were approached by employees who either complained about having to work with Ms. Williams or complained about having to work additional shifts because of her. Nevertheless, there were a number of occasions that Ms. Williams was able to secure a work shift trade. And when Ms. Williams knew she would be scheduled to work on a Sabbath and was unable to secure a work shift trade, she used her vacation days to take the time off.

On a number of other occasions, Ms. Williams called off from work to care for her mother

under preapproved intermittent FMLA leave or called off as sick herself. Many of these call-offs occurred on Friday nights and Saturdays. Ms. Williams never worked on a Saturday (daytime) during the entire time she was in the Pickle Department.

Ms. Williams received discipline in November 2011 due to a safety violation. She was charged with failing to observe a Safe Job Procedure for which she had previously received training. As a result of the safety violation, Ms. Williams was given a three day suspension. However, after the incident, she immediately left work on medical leave for a number of months. There is no evidence that she ever served the suspension or that her pay was reduced.

In May 2013, Ms. Williams was charged with an unjustified absence. This stemmed from a call-off prior to the start of her work shift due to illness. Under the BLA, an employee's absence is excused if there is "just cause" based upon "the pertinent facts."

In support of her absence, Ms. Williams brought in a purported doctor's note; the note was not signed by medical personnel and did not provide sufficient detail to determine whether her call-off was medically justified. As a result, U.S. Steel issued her a written warning.

In August 2013, Ms. Williams called off from work on a Saturday and stated the call-off was because it was the Sabbath. Due to the unjustified absence, U.S. Steel initially issued her a one-day suspension. Ms. Williams did not immediately serve the suspension and later filed a grievance through the union objecting to the suspension. During the course of the grievance proceedings, U.S. Steel advised the union it would reduce the suspension to absentee counseling, so she did not serve a time of suspension.

There are a limited number of Labor Grade 2 positions in the Pickle Department for which work is not scheduled on rotating shifts. Employees in these positions generally work straight shifts

Monday through Friday.

These positions are referred to as preferred assignments and are controlled by the BLA. Under the terms of the BLA, these positions are awarded to qualified employees on the basis of seniority. While in the Pickle Department, Ms. Williams desired a preferred assignment so she could work straight shifts Monday through Friday. The few preferred assignment positions in the Pickle department were already filled by employees with more seniority than Ms. Williams.

When there was an opening for a preferred assignment for a crane operator, Chorzempa gave Ms. Williams the assignment. However, the union representative pointed out to Chorzempa that another qualified employee who had more seniority than Ms. Williams wanted the position and therefore was entitled to it under the BLA. As a result, Chorzempa had to remove Ms. Williams from the position and put her back on the rotating shift schedule.

Later, Ms. Williams sought to leave the Pickle Department, so she bid on a Labor Grade 2 Crane Operator position in the North Sheet Mill. She was awarded the position in September 2013 and made a lateral move to that department.

The North Sheet Mill did not suffer as badly from crane operator shortages as the Pickle Department; however, scheduling Ms. Williams off every Friday night and Saturday would have disrupted any employee scheduling balance they were able to obtain. As a result, she was told she could trade shifts with co-workers if she wanted to be off from work on the Sabbath.

Ms. Williams gave her North Sheet Mill manager a proposed schedule that she thought would work for the three other crane operators on her crew and that would allow her to not work on the Sabbath. Under Ms. Williams's proposed schedule, there were a number of twelve-hour shifts for co-workers, which would require overtime pay; co-workers would also have to work over forty

hours some weeks, which would likewise require overtime pay, and some co-workers would never get certain days or nights of the week off; some co-workers would not get two consecutive days off in violation of the BLA. Ms. Williams would be the only one to work forty hours every week, the only one to get three days off every week, and all of her co-workers would work more hours than she would each month.

Even though the proposed schedule had Ms. Williams working forty hours per week, because some of the shifts on her proposed schedule were for twelve hours, she would still be entitled to overtime pay for working over eight hours in one day.

While working in the North Sheet Mill, Ms. Williams traded shifts, used vacation days, or called off from work for other reasons so she could observe the Sabbath. As of the date of trial, Ms. Williams had not worked a Friday night or Saturday in the North Sheet Mill.

On one or two occasions when the overhead crane Ms. Williams was operating broke down, she had to wait longer than she felt was necessary for assistance. On another occasion, one of Ms. Williams's Pickle Department shift managers tried to correct a pay error regarding her. However, he made the correction after she had already transferred to the North Sheet Mill, and it ultimately ended up altering her paycheck from her new department.

## CONCLUSIONS OF LAW

Ms. Williams's claims against U.S. Steel in her Amended Complaint are:

1.      Failure to make reasonable accommodation for her practice of her religious beliefs;

2.      Discrimination based upon her female gender;

3.      Creation or allowance of harassment by a hostile work environment.

 A.      **Claim of Religious Discrimination by Failure to Accommodate**

Title VII provides that it "shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to [*sic*] an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

To prevail on a claim of religious discrimination due to an employer's failure to provide a reasonable accommodation, "a plaintiff 'must show that the observance or practice conflicting with an employment requirement is religious in nature, that she called the religious observance or practice to her employer's attention, and that the religious observance or practice was the basis for [an adverse employment action].'" *Porter v. City of Chi.*, 700 F.3d 944, 951 (7th Cir. 2012) (quoting *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997)).

If a plaintiff is able to prove the elements of a religious discrimination claim, an employer may still defeat the claim if the employer is able to show that it either offered a reasonable accommodation to the employee, which the employee did not accept, or that it would create an undue burden on the employer. *Porter*, 700 F.3d at 951; 42 U.S.C. § 2000e(j).

U.S. Steel does not dispute whether Ms. Williams's practice of refraining from work during the Sabbath is a genuinely held religious belief. Immediately after transferring to the Pickle Department, she advised her manager that she was a Seventh Day Adventist and requested to be off from work from sunset each Friday to sunset each Saturday in order to observe the Sabbath. At issue is: (1) whether she suffered an adverse employment action due to her religious practices; (2) whether

13

U.S. Steel's offer to allow her to trade shifts with co-workers constituted a reasonable accommodation; and (3) whether accommodating her religious practice would cause U.S. Steel undue hardship.

### 1. Adverse Employment Action

An adverse employment action is one that materially alters the terms and conditions of employment. *Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 648 (7th Cir. 2005) (quoting *Stutler v. Illinois Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001). An employee must show there has been a quantitative or qualitative change in the terms or conditions of employment, *Vawter v. Alcoa, Inc.*, 2008 WL 5220833, at *3 (N.D. Ind. Dec. 10, 2008) (Van Bokkelen, J.) (citing *de la Rama v. Illinois Dep't of Human Servs.*, 541 F.3d 681, 686 (7th Cir. 2008)). In other words, the consequences must be tangible. *Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001) (quoting *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998)). Oral or written reprimands, warnings, and negative performance evaluations do not rise to the level of an adverse employment action. *Id.* Further, the plaintiff must show that the adverse employment action was taken because of a discriminatory motive based upon the employee's religious beliefs. *See Venters v. City of Delphi,* 123 F.3d 956, 972–73 (7th Cir. 1997).

Ms. Williams has not shown a change in the terms or conditions of her employment that would constitute an adverse employment action. At all relevant times, she was paid at a Labor Grade 2 rate of pay, was not demoted, was not given less responsibility, did not have her hours reduced, did not lack opportunities for overtime, nor were her benefits compromised. She was kept in the job position for which she specifically bid—the crane operator position. She later left the Pickle Department and made a lateral move to the North Sheet Mill without any changes to the terms and

conditions of her employment.

Ms. Williams's failure to receive a preferred assignment was not an adverse employment action. Chorzempa tried to place her in an assignment that would allow her to have the Sabbath off from work. However, the preferred assignments that allow employees to work set week days rather than rotating shifts are governed by the seniority provisions of the BLA. When there was an opening for one of these positions for a Labor Grade 2 crane operator, Chorzempa gave her the position. However, the union advised Chorzempa that this was in violation of the seniority provisions of the BLA since another qualified employee who had more seniority than her wanted the assignment. As a result, Chorzempa was forced to remove her from that assignment and place her back on the rotating schedule.

This is analogous to the situation in *Trans World Airlines, Inc. v. Hardison*, where the U.S. Supreme Court held an employer is "not required by Title VII to carve out a special exception to its seniority system in order to help [the plaintiff] to meet his religious obligations." 432 U.S. 63, 83 (1977). If Ms. Williams was not entitled to the preferred assignment in the first place, then it was not an adverse employment action to remove her from that position to which she had no right. Furthermore, since the Pickle Department was short of qualified crane operators, U.S. Steel could not afford to place her in a non-crane operator position in the department.

Ms. Williams did not show that any discipline she received rose to the level of an adverse employment action or was due to her religious practices. She received a three day suspension for a safety violation in November 2011. However, there was no evidence that she ever served the suspension or that her pay was reduced. On another occasion, she received a written warning for failing to justify her call-off due to illness. There was no indication that either of these incidents was

related in any way to her religious beliefs or practices or gender.

Despite the fact Ms. Williams was told that calling off from work for the Sabbath would not be adequate justification for an excused absence, months later she called off, stating the reason was for the Sabbath. As a result, she was initially given a one day suspension. However, U.S. Steel later agreed to give her absentee counseling in lieu of the suspension discipline. She has not experienced any adverse employment consequences associated with her desire to observe the Sabbath.

Since September 2011, when she made her first request to have the Sabbath off from work, Ms. Williams has yet to work on a Friday night or Saturday. She has not shown she has incurred any adverse employment action and thus has failed to prove an essential element of her claim of religious discrimination.

### 2. Reasonable Accommodation

The Seventh Circuit Court of Appeals has long held that a reasonable accommodation is one that "eliminates the conflict between employment requirements and religious practices." *Rodriguez v. City of Chi.*, 156 F.3d 771, 775 (7th Cir. 1998) (quoting *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986) (internal quotation marks omitted)); *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 475 (7th Cir. 2001) (citing *Wright v. Runyon*, 2 F.3d 214, 217 (7th Cir. 1993) (quoting *Ansonia*, 479 U.S. at 70)).

This notwithstanding, cases within the Seventh Circuit Court of Appeals have also held that shift-swapping regimes where a plaintiff has had less than a 100% success rate in securing trades provide a reasonable accommodation. *See U.S. E.E.O.C. v. Bridgestone/Firestone, Inc.*, 95 F. Supp. 2d 913, 928 (C.D. Ill. 2000) ("[A] system of voluntary swaps always depends on willing volunteers, yet courts have consistently found these systems to be reasonable accommodations, even when a

swap was not always possible." (citing *Moore v. A.E. Staley Mfg. Co.*, 727 F. Supp. 1156, 1161 (N.D. Ill. 1989) (citing *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 146 (5th Cir. 1982))); *see also Rodriguez*, 156 F.3d at 776 ("[I]t is a reasonable accommodation to permit an employee to exercise the right to seek job transfers or shift changes, particularly when such changes do not reduce pay or cause loss of benefits." (citations omitted)); *accord Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1322 (11th Cir. 2007); *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1156 (10th Cir. 2000); *Brener*, 671 F.2d at 146; *but see Walker*, 2008 WL 2356997, at *12 ("In theory [the shift-swapping arrangement] appears reasonable, but it is not in reality due to the fact there still exists the potential that, if [a plaintiff] is unable to find a swap, he would be required to either use vacation time to cover the absence or work on [the Sabbath].").

This is not to say that every regime of shift swapping has been held to provide a reasonable accommodation. *See Smith v. Pyro Min. Co.*, 827 F.2d 1081, 1088 (6th Cir. 1987) (holding that allowing an employee to seek to swap shifts was not a reasonable accommodation where the employee believed it was contrary to his faith to ask another to work on the Sabbath); *accord Rodriguez*, 156 F.3d at 776 n.7. Indeed, the *Rodriguez* court qualified its broad statement that shift-swapping arrangements are reasonable accommodations in a footnote, explaining that evaluations of the reasonableness of an accommodation must be made "in the context of the unique facts and circumstances of that case." *Rodriguez*, 156 F.3d at 776 n.7 (citing *Redmond v. GAF Corp.*, 574 F.2d 897, 902–03 (7th Cir. 1978)). Thus, "[i]f the transfer or job-swapping options available to all employees under a [collective bargaining agreement] would not eliminate the particular employee's religious conflict, 'the burden remains on the employer to establish that it is unable to reasonably accommodate the employee's religious beliefs without incurring undue hardship.'" *Id.* (quoting

*Smith*, 827 F.2d at 1085).[1]

Even with this caveat, there is an inherent tension here. Swapping is almost never going to be 100% effective. And an accommodation that merely reduces the frequency or severity of a conflict has not eliminated it. To eliminate, after all, means to "to get rid of" or "remove" something. *Webster's New World Dictionary of The American Language* 199 (1984). It is inconsistent to hold that a reasonable accommodation must eliminate the conflict and yet accept as reasonable some accommodations that plainly do not do so.

One or the other must be discarded. The Eighth Circuit Court of Appeals, for example, has held that elimination of a conflict is not necessary for an accommodation to be reasonable, but that the reasonableness of an accommodation "depends on the totality of the circumstance and might, or might not, require elimination of a particular fact-specific conflict." *Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1031 (8th Cir. 2008).

This appears to be the *de facto* rule in the Seventh Circuit. Indeed, it seems likely, given the Seventh Circuit Court of Appeals' approval of shift-swapping and its approving citation of out-of-circuit cases such as *Brener*, 671 F.2d at 146, that U.S. Steel's shift-swapping arrangement is a reasonable accommodation. This Court need not decide this issue here, however, because (1), as laid out above, Ms. Williams has not suffered an adverse employment action on the basis of her religion and (2), as explained below, even if she had, all other potential accommodations would have caused

---

[1] The *Rodriguez* court had in view cases where a plaintiff has a religious objection to asking someone else to work on the Sabbath. *See Rodriguez v. City of Chi.*, 156 F.3d 771, 776 n.7 (7th Cir. 1998) (citing *Smith v. Pyro Min. Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987)). But this Court sees no reason why this principle should not apply more broadly. Indeed, as mentioned, the *Rodriguez* court acknowledged that each case presents unique circumstances and must be judged individually. *Id.* (citing *Redmond v. GAF Corp.*, 574 F.2d 897, 902–03 (7th Cir. 1978)).

undue hardship on U.S. Steel. But in an appropriate case, this Court thinks clarification of the definition of "reasonable accommodation" would be warranted.

### 3. Undue Hardship

The United States Supreme Court addressed what constitutes an undue burden on the employer in *Hardison*, 423 U.S. at 97. In *Hardison*, weekend work was subject to preferences under the collective bargaining agreement. The plaintiff observed the Sabbath from sunset Friday to sunset Saturday, and, under his religious principles, refrained from work during those hours. The Court stated that the option of either letting the plaintiff work a four day week or replacing him with other qualified personnel "would involve costs to [the employer], either in the form of lost efficiency in other jobs or higher wages." *Id.* at 84. Thus, the Court held that to require an employer to "bear more than a *de minimis* cost in order to give [the plaintiff] Saturdays off is an undue hardship." *Id.*

If Ms. Williams was regularly scheduled off from work for the Sabbath, U.S. Steel would have two choices: (1) let her position go unfilled and suffer the costs associated with production inefficiency and delays, or (2) require another employee to work the shift and suffer the costs of overtime pay with a decrease in morale.

Because of the nature of the work, it is essential to U.S. Steel's business to operate around the clock every day of the year. U.S. Steel states the importance of this to every job applicant to make sure they understand the job requirements and working conditions prior to being hired. The Pickle Department was chronically short of qualified crane operators the entire time Ms. Williams was assigned to that department. The Sabbath hours do not fall neatly within U.S. Steel's set shifts, and they sometimes span across two shifts depending on the time of sunset during the year. Under the BLA, any work over eight hours per day or forty hours per week is subject to the overtime pay

rate of one-and-one-half times the normal pay rate. Scheduling co-workers to cover extra Friday nights and Saturdays would thus require U.S. Steel to pay for additional overtime.

When Ms. Williams transferred to the North Sheet Mill, which did not suffer from the same crane operator shortages, she gave her manager a suggested schedule that she thought would work for the three other co-workers on her crew and that would allow her to regularly be off from work on the Sabbath. Although the schedule would have been beneficial to her, it would have been detrimental to her co-workers. Additionally, it would cause U.S. Steel to suffer a significant amount of overtime pay.

Whether in the Pickle Department or in the North Sheet Mill, U.S. Steel would be required to bear more than a *de minimis* cost in order to regularly schedule Ms. Williams the Sabbath off from work. *Hardison,* 432 U.S. at 84. Giving her the Sabbath off from work would also impose more than a *de minimis* burden on her co-workers. *See Bridgestone/Firestone*, 95 F. Supp. 2d at 929 (citing *Hardison*, 432 U.S. at 84; *Brener*, 671 F.2d at 146–47); *accord Harrell v. Donahue*, 638 F.3d 975, 981 (8th Cir. 2001) (providing a postal worker with Saturdays off would have burdened his co-workers with more weekend work, in part because they did not share the same religious beliefs); *EEOC v. Firestone Fibers & Textiles Co*., 515 F.3d 307, 317 (4th Cir. 2008) (holding that an employer is not required to provide an accommodation if doing so would directly and personally impose on other workers).

Ms. Williams failed to prove her claim of religious discrimination.

### B.     Claim Of Gender Discrimination

Title VII makes it illegal for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation,

terms, conditions, or privileges of employment, because of such individual's sex" 42 U.S.C. §

2000e-2(a)(1). To prevail at trial, a plaintiff must prove that she suffered an adverse employment

action because of her gender. *See Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1992).

Ms. Williams's claim fails for two reasons. First, as discussed above, she failed to present

any evidence showing she suffered an adverse employment action for any unlawful reason. Second,

there is no evidence that things would have turned out any differently if she had been a man. *Id.* She

did not present any direct evidence that her gender factored into any of U.S. Steel's decisions. The

only circumstantial evidence she marshaled at trial to support her claim of gender discrimination is

the treatment of DeJuane Lee, Sr.

There is little similarity between Ms. Williams and Lee other than that they both reported

to the same managers. Lee and Ms. Williams had substantially different job descriptions and

qualifications. She is a Labor Grade 2 Crane Operator; he is a Labor Grade 1 Laborer. Laborers

typically work Monday through Friday and have flexibility in duties since their job is to perform

various tasks as needed within the department. They are also used to fill in on Labor Grade 2

assignments (that do not require specialized qualifications) when there are labor shortages.

On the other hand, Ms. Williams had a distinct assignment—crane operator. She received

specialized training to qualify as an overhead crane operator; and other employees could not fill in

for crane operators when there were shortages. Because the Pickle Department was chronically short

of qualified crane operators, her managers could not afford to let her fill in on other Labor Grade

2 positions within the department like they could with Lee. In a word, Ms. Williams was not

similarly situated to Lee.

Likewise, there is no evidence that U.S. Steel treated them differently in crafting accommodations for their religious beliefs. U.S. Steel addressed Ms. Williams and Lee together in October 2011 and advised that neither of them would be allowed to use the Sabbath as a justified excuse for not showing up for work. Later, both Lee and Ms. Williams called off from work for the Sabbath on separate occasions. Ms. Williams received a one-day suspension, which was downgraded to absentee counseling. Lee received a written warning. These two disciplinary procedures are roughly equivalent. Indeed, Lee's appears worse since a warning is the first step in the progressive discipline process. Ms. Williams was not treated less favorably than Lee.

Ms. Williams failed to prove her claim of gender discrimination.

### C.      Claim Of Discriminatory Harassment

To prevail on a hostile work environment claim, a plaintiff must prove that: "1) her work environment was both objectively and subjectively offensive; 2) the harassment complained of was based on her [religion or gender]; 3) the conduct was either severe or pervasive; and 4) there is a basis for employer liability." *Porter*, 700 F.3 at 955 (quoting *Scruggs v. Garst Seed Co*., 587 F.3d 832, 840 (7th Cir. 2009)).

Ms. Williams failed to present any evidence at trial that her work environment was both objectively and subjectively offensive or that she was harassed based on her gender or her religion, or that the conduct was severe and pervasive; or that there was any basis for employer liability.

Despite the fact that Ms. Williams never actually worked on the Sabbath, she believes not being scheduled off from work on the Sabbath created an offensive work environment. At trial, she presented anecdotal incidents of inconveniences she encountered. For example, when the overhead crane she was operating broke down, she had to wait longer than she felt was necessary for

assistance. On another occasion, one of her Pickle Department shift managers tried to correct a pay error. However, he made the correction after she had already transferred to the North Sheet Mill and it ultimately ended up altering her paycheck from her new department. These types of incidents do not rise to the level of an objectively offensive environment; there was no evidence the incidents were directed at Ms. Williams because of her religion or gender; the incidents were not severe or pervasive; nor was there any basis for employer liability.

Considering the totality of the circumstances, the anecdotal occurrences were neither physically threatening nor humiliating nor did they interfere with Ms. Williams's work performance. These were isolated incidents that did not alter the terms and conditions of her employment. *See Porter*, 700 F.3 at 956.

Ms. Williams failed to prove her claim of discriminatory harassment based on an alleged hostile work environment.

## CONCLUSION

On all claims in the Amended Complaint the Court hereby **ORDERS JUDGMENT** in favor of Defendant United States Steel Corporation against Plaintiff Patrice Williams. She shall take nothing by her Amended Complaint.

The Clerk of this Court shall **ENTER JUDGMENT** accordingly.

So **ORDERED** this 28th day of August, 2014.

/s/ Paul R. Cherry
Paul R. Cherry
Magistrate Judge
United States District Court
Northern District of Indiana

cc:     Plaintiff Patrice Williams, *pro se*

        M. Cristina Sharp and Terence M. Austgen,
        Attorneys for Defendant United States Steel Corporation